IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF IOWA
CENTRAL DIVISION

| | |
|---|---|
| MATTHEW HARMANN,<br><br>Plaintiff,<br><br>vs.<br><br>JAMES MARTIN "MARTY" ARGANBRIGHT, in his individual capacity; JEREMY BENNETT, in his individual capacity; and DANA MINTEER, in her individual capacity,<br><br>Defendants. | 4:24-cv-00336-SHL-WPK<br><br><br>ORDER GRANTING IN PART AND DENYING IN PART<br>MOTION TO DISMISS AND UNSEALING DOCUMENT |

I.  **INTRODUCTION.**

Shortly after Guthrie County Deputy Sheriff Matthew Harmann announced his intention to run for the position of Guthrie County Sheriff, the incumbent County Sheriff, Defendant James Martin "Marty" Arganbright, began investigating Harmann for alleged misconduct. Harmann alleges that this was done in retaliation for Harmann's decision to run for County Sheriff and therefore brings federal and state law claims against Arganbright, Chief Deputy Sheriff Jeremy Bennett, and Guthrie County Attorney Dana Minteer. Defendants move to dismiss, arguing they did not violate Harmann's clearly established rights and that Harmann otherwise has failed to assert viable state and federal law claims. The Court agrees in part with each side. It concludes that Harmann has: (a) failed to state any viable claims against Minteer; (b) failed to state a viable claim against Arganbright and Bennett under Iowa Code § 721.1; but (c) otherwise stated viable claims against Arganbright and Bennett in all respects. The Court therefore GRANTS IN PART and DENIES IN PART Defendants' Motion to Dismiss. (ECF 3.)

Separately, the Court SUSTAINS Defendants' Appeal from Magistrate Judge Decision (ECF 15) and orders that the report summarizing Harmann's investigation (ECF 3-1) be unsealed based on the extent to which Harmann's Complaint places the substance of that report at issue.

II.  **BACKGROUND.**

In ruling on a motion to dismiss, the Court accepts all well-pleaded facts as true and draws all inferences in Harmann's favor. *See Healy v. Fox*, 46 F.4th 739, 743 (8th Cir. 2022). The Court may consider documents and information embraced by the pleadings, including, as relevant here, an investigation report dated May 8, 2024 (ECF 3-1). *See Miller v. Redwood Toxicology Lab'y,*

1

*Inc.*, 688 F.3d 928, 931 n.3 (8th Cir. 2012). The investigation report is referenced in Harmann's Complaint (e.g., ECF 1, ¶¶ 52–53), and neither party disputes its authenticity.

> A. *Events Surrounding Harmann's Announcement of His Candidacy for Guthrie County Sheriff in February 2024.*

At all relevant times, Harmann was a part-time Deputy Sheriff with the Guthrie County Sheriff's Department. (ECF 1, ¶ 4.) On February 1, 2024, he publicly announced his candidacy for the Republication nomination for Guthrie County Sheriff via Facebook. (Id., ¶¶ 14, 19.) The following day, he issued a press release with the same announcement. (Id., ¶ 20.) The press release was published in the *Times Vedette*, a bi-weekly newsletter available to the public electronically. (Id., ¶¶ 21–22.) As of February 1, 2024, Harmann had worked for almost six years as a part-time Deputy Sheriff and had never received an adverse employment review or work-related complaint or been subjected to any disciplinary proceedings. (Id., ¶¶ 8, 14, 15.) Harmann made the decision to run for County Sheriff based on concerns about lack of professionalism within the Sheriff's Department and dissatisfaction with the lack of accountability by the Department's leadership. (Id., ¶ 16.)

Shortly after Harmann's announcement on February 1, Arganbright—the Guthrie County Sheriff—began communicating about the announcement with Guthrie County Chief Deputy Sheriff Jeremy Bennett and Guthrie County Attorney Dana Minteer. (Id., ¶¶ 5–7, 23.) (Arganbright, Bennett, and Minteer will be referred to collectively as "Defendants.") Defendants allegedly agreed in those communications and otherwise "to work together to discredit Harmann and interfere with Harmann's election campaign." (Id., ¶ 25.) More specifically, they allegedly agreed to "use inaccurate and/or false allegations and accusations of misconduct against Harmann to discredit him and therefore undermine his candidacy for Guthrie County Sheriff." (Id., ¶ 26.)

As part of their alleged agreement, Minteer made a disclosure in all criminal cases in which Harmann might be a witness indicating there were issues with Harmann's credibility. (Id., ¶¶ 30, 31, 34–37.) Minteer notified Harmann of her intention to make these disclosures—known colloquially as *Giglio* disclosures[1]—on February 2, 2024, the day after Harmann's Facebook announcement and the same day as Harmann's press release regarding his candidacy for Guthrie County Sheriff. (Id., ¶ 34.) The *Giglio* disclosures revolved around an incident involving Harmann

---

[1] So named after *Giglio v. United States*, 405 U.S. 150 (1972), a watershed decision of the United States Supreme Court requiring prosecutors to disclose evidence to the defense regarding problems with a witness's credibility.

on December 16/17, 2023. (Id., ¶ 35.) Minteer's office never actually investigated that incident, however, nor did she allow Harmann to provide any input about what happened. (Id., ¶¶ 27–29.)

On February 7, 2024, Bennett, acting at Arganbright's direction, authored an "Administrative Investigation Notice" notifying Harmann that the Sheriff's Department intended to open an administrative investigation into the events of December 16/17, 2023. (Id., ¶ 38.) The Administrative Investigation Notice placed Harmann on unpaid administrative leave. (Id., ¶ 40.) Three weeks later, on February 26, 2024, Arbanbright informed Harmann of the nature of the investigation and scheduled an interview for Harmann the following day with Jon Thomas, an investigator hired by the Sheriff's Department to investigate the events of December 16/17, 2023. (Id., ¶ 42–43.) Arganbright and Bennett allegedly told Thomas that Harmann had been placed on administrative leave on January 7, 2024, when in reality this occurred on *February* 7, 2024. (Id., ¶¶ 44, 47.) They allegedly gave Thomas the wrong date so as to give the impression that their disciplinary action preceded Harmann's announcement of his candidacy for County Sheriff. (Id., ¶ 48.) They also allegedly created a falsified version of the Administrative Investigation Notice, backdated to January 7, 2024. (Id., ¶ 45.) Bennett's signature on the Administrative Investigation Notice dated January 7, 2024, looks different than his signature on the one dated February 7, 2024. (Id., ¶ 46.)

Harmann cooperated with Thomas's investigation, including submitting to an interview on February 27, 2024, under the protections of Iowa Code § 80F.1. (Id., ¶¶ 49–50.) Thomas later prepared an investigation report dated May 8, 2024, finding no policy, ethical, professional, or legal violations by Harmann in connection with the incident on December 16/17, 2023. (Id., ¶¶ 51–52.) Arganbright did not file any internal disciplinary proceedings against Harmann within the Sheriff's Department, nor did the Sheriff's Department take any adverse action internally against Harmann. (Id., ¶¶ 54–56.) Nonetheless, according to Harmann, Arganbright "escalated his efforts to unconstitutionally and unlawfully silence his political opposition." (Id., ¶ 53.) Specifically, Bennett—acting at Arganbright's direction—referred Harmann to the Iowa Law Enforcement Academy and requested that Harmann be de-certified as a peace officer. (Id., ¶ 61.) According to Harmann, the referral "was done in bad faith without a reasonable basis to believe Harmann engaged in any misconduct worthy of such a referral." (Id., ¶ 62.) It was "undertaken by the Defendants as a second attempt to silence and eliminate their political rival." (Id., ¶ 63.) As part of this referral, Arganbright and Bennett knowingly and falsely represented that Harmann had been

on administrative leave since January 6, 2024. (Id., ¶ 64.) To support this representation, Arganbright and Bennett created a third version of the Administrative Investigation Notice, with the date amended to January 6, 2024. (Id., ¶¶ 65–66.)

As of the date of Harmann's Complaint, the Iowa Law Enforcement Academy had not served Harmann with any official notices indicating preliminary findings, a contested case hearing, or any other matters. (Id., ¶¶ 68–69.) Harmann continued to serve as a peace officer in Iowa. (Id., ¶ 70.) Nonetheless, Arganbright repeatedly and publicly informed members of the Guthrie County community that Harmann either would be or already had been de-certified by the Iowa Law Enforcement Academy. (Id., ¶¶ 71–72, 74.) He knew this information was false. (Id., ¶ 73.) In addition, in August and September 2024, Arganbright released confidential and protected information regarding Harmann and another Deputy Sheriff. (Id., ¶ 76.) This was done in response to a public records request from one of Arganbright's supporters, Breanna Mink. (Id., ¶ 77.) Arganbright released information about Harmann to Mink without notifying Harmann. (Id., ¶ 78.) At Arganbright's direction, Mink disseminated the information to other members of the public, including another Arganbright supporter, Kassandra Sheeder, who later submitted a letter to the editor to the *Perry News*. (Id., ¶ 79.) The letter to the editor was published on August 30, 2024, and publicly redisclosed information subject to the confidentiality provisions of Iowa Code § 80B.13A(5). (Id., ¶ 80.) The letter contained "multiple factual inaccuracies, intentionally done as a way to impugn the credibility of Harmann and damage his chances of winning the election." (Id., ¶ 81.)

B. *Summary of Thomas's Investigation Report.*

Thomas's investigation report contains, among other things, a summary of the incident involving Harmann in the late night/early morning hours of December 16/17, 2023. Harmann's Complaint itself does not set out the facts underlying that incident, but the Court cannot fully analyze Defendants' Motion to Dismiss without discussing it.

That night, Harmann responded as a secondary officer to assist Deputy Sheriff Caleb Humberg in locating the driver of a utility vehicle that had inadvertently dropped part of its cargo near Harmann's property. (ECF 3-1, p. 2.)[2] Harmann told Humberg to check a nearby path that Harmann knew was commonly used by people on utility vehicles. (Id.) When Humberg did so, he

---

[2] All citations are to the page numbers auto-populated by the electronic case filing (ECF) system and found in the upper-righthand corner of each page. These page numbers do not match the pagination found elsewhere in the report.

located a utility vehicle and saw a person wearing orange running away from it. (Id.) Humberg and a third officer checked the vehicle but did not find anyone else in or near it. (Id.) They later learned the vehicle belonged to a *different* Guthrie County Deputy Sheriff, Taylor Wheatley. (Id.) Humberg made several attempts to contact Wheatley by calling his work cell phone (rather than his personal cell phone) but did not reach him. (Id.)

While Harmann was in route to Humberg's location, Wheatley called Harmann to figure out what Humberg was doing. (Id.) Harmann said Humberg was trying to find the driver of a utility vehicle that dropped deer meat. (Id.) At the time, Harmann did not realize Wheatley was in the area, as he believed Wheatley was at a wedding and the registration check identifying Wheatley as the owner of the utility vehicle had not yet been returned to Humberg. (Id., pp. 2–3.) It appears that Harmann later began to suspect Wheatley's involvement, as he made additional calls to Wheatley. (Id., p. 6.) Some of those calls went unanswered, but one resulted in a discussion in which Wheatley told Harmann that "[n]othing" was going on and to "[s]tay out of it." (Id.) Eventually, Harmann discovered Wheatley on the side of the road and gave him a ride home. (Id., p. 7.) By that point, it apparently was clear that Wheatley had been the driver of the utility vehicle. (Id.) Harmann told Wheatley to call Humberg and take responsibility for what happened. (Id.) Wheatley did so. (Id., p. 9.)

Thomas's investigation report was prompted by purported concerns about whether Harmann interfered with Humberg's investigation and/or provided false information about Wheatley. (Id., p. 3.) Thomas concluded that Harmann did not interfere with any enforcement action because Humberg's attempt to locate the driver of the utility vehicle was a "community caretaking function," not an enforcement action. (Id., p. 9.) Thomas further concluded that Harmann was "essentially" honest and truthful during the incident and did not appear to have been trying to conceal material facts. (Id.) At most, Thomas found that Harmann "could have" told Humberg about the initial phone call Harmann received from Wheatley while Humberg was looking for the utility vehicle. (Id.) Thomas explained, however, that Harmann would not necessarily have attached any significance to Wheatley's call because the two men spoke regularly and thus it "did not necessarily seem out of character" for the phone call to have been made. (Id.) In other words, there is no reason for Harmann to have interpreted the call from Wheatley as meaning Wheatley had been the driver of the utility vehicle or otherwise involved in the incident.

C.  *Procedural History.*

Harmann brings five substantive claims: <u>Division One</u>: political retaliation and discrimination against Arganbright pursuant to 42 U.S.C. § 1983 based on alleged violations of the First and Fourteenth Amendments; <u>Division Two</u>: conspiracy to commit political retaliation and discrimination against Arganbright, Bennett, and Minteer pursuant to 42 U.S.C. §§ 1983 and 1985 based on alleged violations of the First and Fourteenth Amendments; <u>Division Three</u>: a cause of action pursuant to Iowa Code § 80F.1(13) against Arganbright, Bennett, and Minteer based on violations of the guarantees set forth in §§ 80F.1(15) and (16); <u>Division Four</u>: felonious misconduct in office against Arganbright and Bennett based on violations of Iowa Code § 721.1; and <u>Division Five</u>: violation of the confidentiality provisions of Iowa Code § 80F.1(20) against Arganbright based on his disclosure of materials to Mink. (*See generally* ECF 1, pp. 16–27.) Harmann requests compensatory and punitive damages, attorney fees and costs, and injunctive relief. (Id., pp. 27–28.) Defendants move to dismiss Harmann's Complaint in its entirety. (ECF 3.) Defendants also urge the Court to unseal the Thomas investigation report, which Defendants attached to their Motion to Dismiss and was subsequently sealed upon Harmann's request. (ECF 6; ECF 10; ECF 15.) Harmann resists in all respects. (ECF 5.)

### III. LEGAL STANDARDS.

*A. Motion to Dismiss.*

"To survive a motion to dismiss, a complaint must contain sufficient factual matter . . . to 'state a claim to relief that is plausible on its face.'" *Rydholm v. Equifax Info. Servs. LLC*, 44 F.4th 1105, 1108 (8th Cir. 2022) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678 (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007)). "The plausibility standard requires a plaintiff to show at the pleading stage that success on the merits is more than a 'sheer possibility.'" *Braden v. Wal-Mart Stores, Inc.*, 588 F.3d 585, 594 (8th Cir. 2009) (quoting *Iqbal*, 556 U.S. at 678). In determining plausibility, the Court accepts all factual allegations in the complaint as true and draws all reasonable inferences in the plaintiff's favor. *Richter v. Advance Auto Parts, Inc.*, 686 F.3d 847, 850 (8th Cir. 2012) (per curiam). The Court is not, however, "obligated to accept legal conclusions, and '[a] pleading that offers labels and conclusions or a formulaic recitation of the elements of a cause of action will not do.'" *United States ex rel.*

*Ambrosecchia v. Paddock Lab'ys, LLC*, 855 F.3d 949, 955 (8th Cir. 2017) (alteration in original) (quoting *Iqbal*, 556 U.S. at 678).

It is well established that the Court may consider materials outside the pleadings that are "necessarily embraced by the complaint." *Ashanti v. City of Golden Valley*, 666 F.3d 1148, 1151 (8th Cir. 2012). "Documents necessarily embraced by the pleadings include 'documents whose contents are alleged in a complaint and whose authenticity no party questions, but which are not physically attached to the pleading.'" *Id.* (quoting *Kushner v. Beverly Enters., Inc.*, 317 F.3d 820, 831 (8th Cir. 2003)). "[C]ourts additionally consider 'matters incorporated by reference or integral to the claim, items subject to judicial notice, matters of public record, orders, items appearing in the record of the case, and exhibits attached to the complaint whose authenticity is unquestioned;' without converting the motion into one for summary judgment." *Miller*, 688 F.3d at 931 n.3 (quoting 5B Charles Alan Wright & Arthur R. Miller, *Fed. Prac. & Proc.* § 1357 (3d ed. 2004)).

B. *Qualified Immunity: Federal Law.*

Under 42 U.S.C. § 1983, liability is imposed on any person who, acting under color of law, "subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws." Thus, "[t]o state a claim under § 1983, a plaintiff must allege the violation of a right secured by the Constitution and laws of the United States, and must show that the alleged deprivation was committed by a person acting under color of state law." *West v. Atkins*, 487 U.S. 42, 48 (1988).

Government officials are protected against § 1983 claims by the doctrine of qualified immunity, which frees them from liability unless their conduct violates "clearly established statutory or constitutional rights of which a reasonable person would have known." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). "Qualified Immunity 'is an *immunity from suit* rather than merely a defense to liability.'" *Solomon v. Petray*, 699 F.3d 1034, 1038 (8th Cir. 2012) (quoting *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985)). "Qualified immunity balances two important interests–the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Pearson*, 555 U.S. at 231. Qualified immunity "is effectively lost if a case is erroneously permitted to go to trial." *Mitchell*, 472 U.S. at 526.

Law enforcement officers are entitled to qualified immunity "unless: (1) [they] violated a constitutional right, and (2) that constitutional right was clearly established so that a reasonable officer would know of the right at the time of the alleged violation." *Thurairajah v. City of Fort Smith*, 925 F.3d 979, 982 (8th Cir. 2019). Courts may address these issues in either order, and a plaintiff must satisfy both prongs before a claim may proceed. *See Pearson*, 555 U.S. at 236. "Under either prong of the inquiry, the district court 'may not resolve genuine disputes of fact' relevant to the issue of qualified immunity." *Wealot v. Brooks*, 865 F.3d 1119, 1125 (8th Cir. 2017) (quoting *Tolan v. Cotton*, 572 U.S. 650, 656 (2014) (per curiam)).

    C. *Qualified Immunity: State Law.*

Iowa Code Chapter 670, commonly known as the Iowa Municipal Tort Claims Act, "allows people to assert claims against municipalities that otherwise would have been barred by governmental immunity." *Sutton v. Council Bluffs Water Works*, 990 N.W.2d 795, 797 (Iowa 2023). It also establishes certain immunities and defenses for municipal and county employees who "historically . . . could be sued in their individual capacities for torts they had committed and were not protected by sovereign or governmental immunity." *Thomas v. Gavin*, 838 N.W.2d 518, 521 (Iowa 2013). These immunities include Iowa Code § 670.4A(1)(a), which states that a municipal or county employee is not liable for monetary damages if "[t]he right, privilege, or immunity secured by law was not clearly established at the time of the alleged deprivation, or at the time of the alleged deprivation the state of the law was not sufficiently clear that every reasonable employee would have understood that the conduct alleged constituted a violation of law." "In enacting § 670.4A, it appears the Iowa Legislature was adopting a state law version of qualified immunity that tracks the qualified immunity doctrine as it exists under federal law." *Stark v. Hamelton*, No. 3-18-CV-00069-RGE-SHL, 2021 WL 4056716, at *4 (S.D. Iowa Sept. 2, 2021).

**IV.   LEGAL ANALYSIS: MOTION TO DISMISS.**

    A. *Harmann Has Stated Viable Section 1983 Claims Against Arganbright and Bennett But Not Minteer.*

Harmann brings a § 1983 claim against Arganbright individually for political retaliation and discrimination (Division One) and a § 1985 claim against all three Defendants for conspiracy to commit political retaliation and discrimination (Division Two). For reasons explained below, the Court DENIES Defendants' Motion to Dismiss as it relates to the claims against Arganbright and Bennett. The Court GRANTS the Motion to Dismiss as it relates to the claim against Minteer, although not for the reasons proffered by Defendants.

1. <u>Harmann Has Asserted Plausible § 1983 Claims Against Arganbright and Bennett</u>.

Defendants' arguments for dismissal of Harmann's § 1983 claims revolve largely around the contents of Thomas's investigation report. Defendants assert, among other things, that Thomas's report "expressly finds [Harmann] was untruthful with other investigating officers on December 17" and that Harmann has a "documented history of untruthfulness." (ECF 3, pp. 6, 7.) Defendants argue that the substance of Thomas's report proves as a matter of law that they had a legitimate basis for having Harmann investigated and making statements about that investigation.

Defendants' arguments fail on several levels. <u>First</u>, they are distorting the contents of Thomas's report. Thomas did *not* state that Harmann was "untruthful" or has a "documented history of untruthfulness." To the contrary, Thomas concluded that Harmann was essentially honest and truthful during the incident on December 16/17, 2023. At most, Thomas said Harmann "could have" notified Humberg sooner about receiving the phone call from Wheatley, although Thomas also said Harmann's failure to do so was understandable in context and did not necessarily mean Harmann was trying to obstruct Humberg's investigation. Furthermore, Thomas pointed out that Harmann told Wheatley that night to call Humberg and admit what happened—which Wheatley did. In Thomas's words: "If Harmann was attempting to conceal Wheatley's role in this incident, Harmann would not have directed Wheatley to call Humberg or likely admitted to driving Wheatley home during the investigation." (ECF 3-1, p. 11.)

<u>Second</u>, Defendants' arguments miss the full scope of Harmann's allegations. Harmann accuses Arganbright and Bennett of retaliation not merely for initiating the Thomas investigation, but also for, among other things, referring Harmann to the Iowa Law Enforcement Academy for disciplinary proceedings despite Thomas's conclusion that Harmann did not commit misconduct. In this regard, the substance of Thomas's report *helps* Harmann's claim because it shows that Thomas indeed cleared Harmann of wrongdoing. The fact that Arganbright and Bennett referred him to the Iowa Law Enforcement Academy anyway gives rise to a plausible inference of retaliatory intent. *See Williams v. City of Carl Junction*, 523 F.3d 841, 843 (8th Cir. 2008) ("Retaliatory motive . . . may be proved by circumstantial evidence giving rise to an inference of retaliatory intent."). The timing of Arganbright's and Bennett's actions reinforces the inference of retaliation, as they did not initiate the investigation into Harmann's conduct, place Harmann on unpaid administrative leave, or make the referral to the Iowa Law Enforcement Academy until shortly after Harmann announced his intention to run for Arganbright's position as County Sheriff

even though the underlying incident occurred more than six weeks earlier. *See Davison v. City of Minneapolis*, 490 F.3d 648, 657 (8th Cir. 2007) ("[T]emporal proximity between protected activity and an adverse employment action can contribute to establishing the third element of a prima facie case of retaliation.").

Third, and relatedly, Defendants' arguments also miss the mark under the "clearly established" prong of the § 1983 analysis. Defendants argue that "the law is not clearly established that a sheriff investigating allegations of dishonesty by a deputy that arose prior to the deputy's protected speech violates the First Amendment." (ECF 3, p. 8.) As phrased, this is almost certainly true. But it distorts Harmann's allegations. He asserts that Arganbright and Bennett initiated the investigation and placed him on unpaid administrative leave *solely because he publicly announced his candidacy for County Sheriff*, and not based on genuine concerns about his truthfulness. In other words, Harmann accuses Arganbright and Bennett of interfering with his First Amendment right to engage in constitutionally protected political activity. This is a clearly established right. *See Heffernan v. City of Paterson*, 578 U.S. 266, 268 (2016) ("The First Amendment generally prohibits government officials from dismissing or demoting an employee because of the employee's engagement in constitutionally protected political activity.").

As noted above, Harmann's retaliation allegations are plausible given the temporal proximity between the public announcement of his candidacy for County Sheriff and Arganbright's decision to open an investigation and place him on unpaid administrative leave. Moreover, Harmann alleges that Arganbright and Bennett continued to engage in retaliatory conduct (like referring him to the Iowa Law Enforcement Academy) even after Thomas's report cleared Harmann of wrongdoing. It follows that Harmann has done enough at this stage to plausibly infer that Arganbright and Bennett violated his clearly established right to participate in electoral activities without reprisal. *See Shockency v. Ramsey Cnty.*, 493 F.3d 941, 948 (8th Cir. 2007) (denying qualified immunity for county sheriff who allegedly demoted employee for participating in campaign activities).

To be sure, it may prove to be the case that Arganbright and Bennett were motivated by good faith concerns about Harmann's honesty. If so, Harmann's claims will not succeed. To reach this conclusion at the motion to dismiss stage, however, the Court would have to accept Arganbright's and Bennett's version of events and/or draw inferences *against* Harmann. This the Court cannot do. *See Richter*, 686 F.3d at 850; *Fleshner v. Tiedt*, 715 F. App'x 575, 576 (8th Cir.

2018) (per curiam) (reversing dismissal of § 1983 claims) For these reasons, the Court will not dismiss Harmann's § 1983 claim against Arganbright individually in Division One.

The Court likewise will not dismiss Harmann's conspiracy claim against Arganbright and Bennett in Division Two. In addition to the plausible allegations discussed above, the Complaint contains sufficient detail about the specific actions taken by each of Arganbright and Bennett to satisfy Fed. R. Civ. P. 12(b)(6). Specifically, the Complaint alleges that each of Arganbright and Bennett was involved in the decision to open the investigation in the first place, place Harmann on unpaid administrative leave, refer him to the Iowa Law Enforcement Academy for potential discipline, and backdate (twice) the Notice of Administrative Investigation (which Bennett signed) to give the impression that the investigation predated Harmann's announcement of his candidacy for County Sheriff. These allegations, combined with the vague-but-not-irrelevant allegation that Arganbright and Bennett communicated immediately after Harmann announced his candidacy about how to discredit him, are enough to satisfy the pleading requirements reflected in cases like *Faulk v. City of St. Louis*, 30 F.4th 749, 747–48 (8th Cir. 2022). Which is to say, the Complaint contains "specific and plausible allegations linking [Arganbright and Bennett] to the overt acts that [the Complaint] alleges defendants committed against [Harmann]." *Id.* at 747. The Court therefore DENIES the Motion to Dismiss as to Divisions One (against Arganbright) and Division Two (against Arganbright and Bennett).

2. <u>Minteer Is Entitled to Prosecutorial Immunity on Harmann's § 1983 Claim</u>.

The Court reaches a different conclusion as to Minteer. Harmann's Complaint specifically alleges her involvement in the conspiracy only in the narrow sense that she: (a) communicated with Arganbright and Bennett on February 2, 2024, about Harmann's candidacy for County Sheriff; (b) communicated to Harmann the same day that she intended to provide *Giglio* notices to defense attorneys in cases where Harmann might be a witness; and (c) in fact provided those *Giglio* notices on at least one occasion. Although not raised by Defendants, the Court feels compelled in these circumstances to *sua sponte* consider whether prosecutorial immunity protects Minteer from § 1983 liability. The Court concludes that it does.

Prosecutors are generally entitled to absolute immunity for actions "intimately associated with the judicial phase of the criminal process." *Van de Kamp v. Goldstein*, 555 U.S. 335, 343 (2009) (quoting *Imbler v. Pachtman*, 424 U.S. 409, 430 (1976)). "*Brady* and *Giglio* duties are functionally prosecutorial—they are intimately related to the judicial phase of the criminal

11

process." *Fields v. Wharrie*, 672 F.3d 505, 513 (7th Cir. 2012) (citing *Imbler*, 424 U.S. at 430). Here, even after drawing all inferences in Harmann's favor, everything in the Complaint about Minteer's involvement in the alleged conspiracy revolves around her execution of her *Giglio* responsibilities. She is entitled to absolute prosecutorial immunity from Harmann's claims in these circumstances. *See Savage v. Maryland*, 896 F.3d 260, 272 (4th Cir. 2018) (holding that state's attorney was entitled to prosecutorial immunity from First Amendment retaliation claim arising out of *Giglio* disclosures that implied problems with the plaintiff's honesty or credibility); *Roe v. City & County of San Francisco*, 109 F.3d 578, 583 (9th Cir. 1997) (similar; affirming grant of summary judgment on retaliation claim).

The Court understands, of course, that this holding might permit an unscrupulous prosecutor to disseminate unfavorable false information about a law enforcement officer with impunity. So be it. The Supreme Court has recognized that prosecutorial immunity "reflects 'a balance' of 'evils'" in which it is better "to leave unredressed the wrongs done by dishonest officers than to subject those who try to do their duty to the constant dread of retaliation." *Van de Kamp*, 555 U.S. at 340 (quoting *Gregoire v. Biddle*, 177 F.2d 579, 581 (2d Cir. 1949) (Hand, C.J.)). This balancing of harms is particularly important in the context of *Giglio* disclosures, which are designed to protect the constitutional rights of persons accused of criminal offenses. It would be inappropriate to place prosecutors in the untenable position of worrying that making such disclosures might trigger § 1983 liability.

In *Savage*, the Fourth Circuit held that absolute prosecutorial immunity applies even when the plaintiff brings First Amendment retaliation claims that focus on the impact of the *Giglio* notice on the plaintiff's employment. 896 F.3d at 270. *Savage* explained that "[d]ecisions regarding witness testimony—which witnesses to call, whether potential witnesses are credible, and how to proceed in the face of credibility questions—are a core prosecutorial function, directly tied to the conduct of a criminal trial." *Id*. Accordingly, "decisions about 'which witnesses to call' are among the 'sensitive issues' that prosecutors must address in their capacity as advocates as they prepare for trial, fully shielded by immunity." *Id.* (quoting *Imbler*, 424 U.S. at 430 n.33); *see also Roe*, 109 F.3d at 584 ("[A] prosecutor's professional evaluation of a witness is entitled to absolute immunity even if that judgment is harsh, unfair or clouded by personal animus, as [plaintiff] alleges here."). *Savage* further explained why it is so important to give prosecutorial immunity to government attorneys not just when they are sued by criminal defendants for failing to make *Giglio* disclosures,

*see Van de Kamp*, 555 U.S. at 344, but also they are sued by the law enforcement witnesses who are the subject of such disclosures:

> Otherwise, we would be left with a lopsided immunity that provides full protection when a prosecutor ignores credibility concerns regarding a state witness, but withholds protection when he does not. That kind of 'asymmetrical' prosecutorial immunity would be worse than none at all, creating the risk that prosecutors' decision-making could be skewed in one direction—*against* taking steps to address credibility concerns—by fear of damages liability.

*Id.*

The Fourth Circuit's logic squarely applies here and compels the conclusion that Harmann's § 1983 claim against Minteer is barred by prosecutorial immunity. *See also Van de Kamp*, 555 U.S. at 340 ("The public trust of the prosecutor's office would suffer were the prosecutor to have in mind [her] own potential damages liability when making prosecutorial decisions—as [she] might well were [she] subject to § 1983 liability." (internal punctuation omitted)). Accordingly, the Court GRANTS the Motion to Dismiss as to Division Two against Minteer.

### B. Harmann Has Stated Viable Claims Under Iowa Code § 80F.1(13) Against Arganbright and Bennett But Not Minteer.

Harmann brings three state law claims, the first of which (Division Three) is against all three Defendants for violating Iowa Code § 80F.1(13). The Court concludes that he has stated viable claims against Arganbright and Bennett but not Minteer.

#### 1. Background Regarding Iowa Code § 80F.1.

In 2007, the Iowa Legislature enacted Iowa Code § 80F.1, known as the "Peace Officer, Public Safety, and Emergency Personnel Bill of Rights." The statute was later amended in 2021, 2022, 2023, and 2024. *See* IA LEGIS 183 (2021), 2021 Ia. Legis. Serv. Ch. 183 (S.F. 342) (West); IA LEGIS 1142 (2022), 2022 Ia. Legis. Serv. Ch. 1142 (H.F. 2496) (West); IA LEGIS 149 (2023), 2023 Ia. Legis. Serv. Ch. 149 (H.F. 631) (WEST); IA LEGIS 1121 (2024), 2024 Ia. Legis. Serv. Ch. 1121 (H.F. 2592) (WEST); IA LEGIS 1058 (2024), 2024 Ia. Legis. Serv. Ch. 1058 (H.F. 2163) (WEST). "This law provides 'officers'—as defined in the statute—with certain rights and procedural protections, particularly during the course of investigations into complaints of alleged misconduct." *Dautovic v. Bradshaw*, No. 09-1763, 2011 WL 1005432, *1 (Iowa Ct. App. Mar. 21, 2011). Iowa Code § 80F.1(15) states: "An officer shall have the right, as any other citizen, to engage in political activity except while on duty as long as the officer's political activity does not violate the federal Hatch Act, 5 U.S.C. § 1501 et seq. . . . " Iowa Code § 80F.1(16) states: "An

officer shall not be discharged, disciplined, or threatened with discharge or discipline in retaliation for exercising the rights of the officer enumerated in this section." Iowa Code § 80F.1(13) states: "An officer shall have the right to bring a cause of action against any person[ or] group of persons . . . for damages arising from . . . any other violation of this chapter including but not limited to actual damages, court costs, and reasonable attorney fees."

      2. <u>Harmon Has Asserted Plausible § 80F.1(13) Claims Against</u> Arganbright and Bennett.

Defendants argue that they are entitled to qualified immunity on Harmann's Division Three because the relevant provisions of Iowa Code § 80F.1 have never been interpreted in any reported cases, and thus there is no "clearly established" right that they could have violated. The Court disagrees. Iowa Code §§ 80F.1(15) and (16) are straightforward and easy to understand. Indeed, they simply summarize well-established federal law protecting government officials from being retaliated against for engaging in political activity. It follows that Defendants did not need a court ruling to understand what they could and could not do. *See Vinyard v. Wilson*, 311 F.3d 1340, 1350 (11th Cir. 2002) (holding that the words of a statute standing alone will be enough in some cases to make the law clearly established); *Baribeau v. City of Minneapolis*, 596 F.3d 465, 478 (8th Cir. 2010) ("The fundamental question under this analysis is whether the state of the law, as it existed at the time of the [defendant's conduct], gave the defendants 'fair warning' that the [conduct] was [unlawful]."); *cf. Carreras v. Iowa DOT*, 977 N.W.2d 438, 446 (Iowa 2022) ("Our inquiry ends with the plain language of a statute if the statute is unambiguous." (quoting *State v. Zacarias*, 958 N.W.2d 573, 581 (Iowa 2021))). Furthermore, for reasons explained in the preceding section, Harmann has plausibly alleged that Arganbright and Bennett indeed engaged in impermissible retaliation. The Court therefore DENIES the Motion to Dismiss as to Division Three against Arganbright and Bennett.

      3. <u>Minteer Is Entitled to Prosecutorial Immunity on Harmann's State Law Claim.</u>

The Court again reaches a different conclusion as to Minteer. The Iowa Supreme Court has long recognized that prosecutors have "absolute immunity related to the prosecution of criminal cases." *Venckus v. City of Iowa City*, 930 N.W.2d 792, 804 (Iowa 2019) (citing *Blanton v. Barrick*, 258 N.W.2d 306, 309 (Iowa 1977)). As with federal law, this immunity extends under Iowa law to all activities "intimately associated with the judicial phase of the criminal process," including whether and how to prosecute cases. *Id.* (quoting *Hike v. Hall*, 427 N.W.2d 158, 159 (Iowa 1988)). Absolute immunity applies "without regard to motive or intent." *Id.* "The 'immunity applies even

when the official is accused of acting maliciously and corruptly because as a matter of policy it is in the public best interest that officials should exercise their function without fear of consequences and with independence." *Id.* (cleaned up) (quoting *Blanton*, 258 N.W.2d at 308).

The Court is confident the Iowa Supreme Court would extend absolute prosecutorial immunity to decisions about whether and when to issue *Giglio* notices. *See Beck v. Phillips*, 685 N.W.2d 637, 644 (Iowa 2004) (holding that absolute immunity would apply to a decision not to prosecute a class of cases in which a law enforcement witness with credibility issues would appear as a witness). Indeed, Iowa Code § 80F.1(24)(i) expressly states that the subsection relating to *Giglio* disclosures "does not create a private cause of action against a prosecuting agency or an employee of a prosecuting agency." As the only allegations in Harmann's Complaint against Minteer revolve around *Giglio* disclosures, she is entitled to immunity on Division Three, just as she was on Division Two. Accordingly, the Motion to Dismiss is GRANTED as to Minteer on Division Three.

    C. *Harmann Has Not Stated a Viable Claim Against Arganbright and Bennett Under Iowa Code § 721.1.*

Harmann's Division Four alleges that Arganbright and Bennett committed felonious misconduct in office in violation of Iowa Code § 721.1, which makes it a class "D" felony to falsify any public record. Defendants move to dismiss on the basis that section 721.1 is a criminal statute that does not give rise to a private cause of action. The Court agrees.

The Iowa Supreme Court has never decided whether Iowa Code § 721.1 creates a private right of action. It has, however, established a framework for the Court to use in making the determination. As a starting point, "[n]ot all statutory violations give rise to a private cause of action. A private statutory cause of action exists 'only when the statute, explicitly or implicitly, provides for such a cause of action.'" *Mueller v. Wellmark, Inc.*, 818 N.W.2d 244, 253 (Iowa 2012) (quoting *Sanford v. Manternach*, 601 N.W.2d 360, 371 (Iowa 1999)). "[L]egislative intent is the most important factor in the analysis," and the "'central inquiry' is whether the legislature intended to create a private right to sue." *Shumate v. Drake Univ.*, 846 N.W.2d 503, 508, 509 (Iowa 2014). If the legislative intent is not clear from the text and structure of the statute, other factors may be considered. *See id.* These factors include: "whether 'the plaintiff is a member of the class for whose special benefit the statute was enacted'; . . . whether 'a private cause of action is consistent with the underlying purpose' of the statute; and . . . whether 'the implication of a private cause of action will intrude into an area … which has been delegated exclusively to a state administrative agency.'"

15

*Id.* at 508 (cleaned up) (quoting *Seeman v. Liberty Mut. Ins. Co.*, 322 N.W.2d 35, 41–43 (Iowa 1982)).

Here, there is nothing in the text or structure of section 721.1 to suggest the Iowa Legislature intended to create a private right of action. To the contrary, the statute purports only to establish *criminal* liability for the falsification of public records. The same is true of Chapter 721 as a whole: it establishes *criminal* liability in various places for official misconduct but never purports to allow enforcement through *civil* causes of action. *See, e.g.*, Iowa Code §§ 721.2 (describing conduct that constitutes a serious misdemeanor); 721.7 (same); 721.9 (same); 721.10 (same); 721.11 (same). After taking such great care to expressly identify criminal penalties for violations of Chapter 721, it is difficult to imagine the Iowa Legislature also silently intended to allow for civil enforcement. *See Marcus v. Young*, 538 N.W.2d 285, 289 (Iowa 1995) (declining to recognize private cause of action where relevant Iowa Code chapter identified numerous *other* remedies but did not purport to create private remedy). To that end, the provisions of Chapter 721 have existed in some form or another for more than forty years, yet the Court can locate no reported case in which a party even attempted to bring a private cause of action under it. This is presumably because there is nothing in the text of the statute to support the existence of an implied private right of action. Based on the text of the statute alone, the Court concludes that Harmann does not have a viable cause of action under section 721.1.

In arguing otherwise, Harmann relies on Iowa Code § 611.21, which states that "[t]he right of civil remedy is not merged in a public offense and is not restricted for other violation of law, but may in all cases be enforced independently of and in addition to the punishment of the former." The Iowa Supreme Court has explained, however, that "while section 611.21 prevents merger of a civil remedy in a criminal offense, it does not *create* a civil cause of action for the violation of a criminal statute absent legislative intent to do so." *Shumate*, 846 N.W.2d at 516. As there is nothing in section 721.1 or Chapter 721 to indicate a legislative intent to create a private cause of action, section 611.21 is of no assistance to Harmann. *See id.* (declining to find private cause of action where "procedural framework" of the relevant chapter indicated no legislative intent to do so).

To the extent the Court is obligated to consider the other factors identified in *Shumate*, they reinforce the absence of a private cause of action in section 721.1. First, it is at best debatable whether Harmann "is a member of the class for whose special benefit the statute was enacted." *Id.* at 508. Section 721.1 is a broadly worded statute designed to criminalize the making of false

16

records across-the-board in all government agencies at all levels. It therefore does not appear to afford any "special" status to any specific person or group of people. Accordingly, this factor is "neutral at best." *Hutchcroft-Darling v. Boecker*, No. C19-0011-LTS, 2020 WL 2776498, at *12 (N.D. Iowa May 28, 2020) (concluding that Iowa Legislature did not create private right of action for violations of Iowa Code § 718.6(1) because, *inter alia*, the statute was designed to protect the "general public"), *aff'd*, No. 22-2118, 2023 WL 4174074 (8th Cir. June 26, 2023).

Second, it is doubtful that the recognition of a private cause of action would advance the Legislature's goals when it enacted section 721.1. True, giving citizens a private cause of action would create an additional incentive for government officials not to make false statements in public records. However, the Legislature has been careful not to go too far in exposing government officials to liability, as illustrated by, for example, the enactment of Iowa Code Chapter 670 as the "exclusive remedy" for torts against municipalities and their employees. *Rucker v. Humboldt Cmty. Sch. Dist.*, 737 N.W.2d 292, 293 (Iowa 2007). Recognizing a private cause of action under section 721.1 would interfere with the balance the Legislature appears to have been trying to strike between holding government officials responsible for false statements but not exposing them too broadly to civil liability. *See Marcus*, 538 N.W.2d at 290 (refusing to recognize implied private cause of action where Legislature's creation of some remedies but not others indicated the balance it was trying to strike); *Hutchcroft-Darling*, 2020 WL 2776498, at *12 (declining to recognize private cause of action where Legislature established "numerous other remedies for holding a law enforcement officer accountable for allegedly including false information in his or her police report").

Third, and finally, the Legislature's repeated references in Chapter 721 to criminal penalties indicates that it wanted the statute to be enforced by state and local prosecutors, not private citizens. The recognition of a private cause of action would intrude on that legislative determination. *See id.* ("[A] private cause of action under this statute could arguably intrude upon the authority that has been exclusively delegated to various state and local law enforcement agencies.").

For these reasons, the Court concludes that the Iowa Legislature did not intend to create a private cause of action when it enacted Iowa Code § 721.1. It follows that Defendants' Motion to Dismiss is GRANTED as to Division Four.

### D. Harmann Has Stated a Viable Claim Against Arganbright for Violating Iowa Code § 80F.1(20).

Harmann's final claim (Division Five) is against Arganbright for allegedly violating Iowa Code § 80F.1(20), which governs confidentiality in connection with internal investigations of government officials. Section 80F.1(20) states, in relevant part: "The employing agency shall keep an officer's statement, recordings, or transcripts of any interviews or disciplinary proceedings, and any complaints made against an officer confidential unless otherwise provided by law or with the officer's written consent." Harmann alleges that Arganbright violated section 80F.1(20) when he released the Thomas report in response to an open records request. Arganbright, in turn, argues that the Thomas report is not "a recording or transcript of any interview or disciplinary proceeding," and thus the production of that report does not violate section 80F.1(20). In the alternative, Arganbright argues that even if the Thomas report is governed by section 80F.1(20), this was not "clearly established" at the time of his conduct and thus he is protected by qualified immunity under Iowa Code § 670.4A.

The Court disagrees with Arganbright in both respects. Thomas's report unmistakably includes the substance of both the complaint against Harmann and Harmann's interview in response thereto. Specifically, as to the complaint, Thomas's report states: "The purpose of this investigation rests with Harmann's behavior and if he interfered or provided false information at any point to Humberg regarding Wheatley's involvement in this incident." (ECF 3-1, p. 3.) Under any fair reading, this is a summary of the complaint against Harmann; i.e., it makes clear that someone accused Harmann of interfering with an investigation and/or providing false information in connection therewith. This is reiterated in the report's list of "[p]otential policy violations" (id., p. 4) and again in a section making findings on "whether or not Harmann interfered with any enforcement action" and "whether Harmann was dishonest or untruthful in the handling of this incident" (id., p. 9). It follows that Thomas's report includes "complaints made against an officer" for purposes of Iowa Code § 80F.1(20).

Similarly, the only fair reading of the Thomas report is that it discloses Harmann's interview. Indeed, there is a section unambiguously captioned "Harmann Interview" that spends two-and-one-half pages summarizing what Harmann told Thomas, sometimes with verbatim quotes. (Id., pp. 5–7.) The section even includes a reference to "Iowa Code 80F." (Id., p. 5.) The report similarly contains sections entitled "Humberg Interview" and "Wheatley Interview" that

summarize what *those* officers told Thomas. (Id., pp. 7–9.) The report therefore contains Harmann's (and the other officers') "statement[s]" for purposes of Iowa Code § 80F.1(20).

In arguing otherwise, Arganbright urges the Court to adopt an absurdly narrow interpretation of section 80F.1(20). The statute's plain language shows that it is designed to ensure the confidentiality of internal investigations of government officials. Arganbright's interpretation would eviscerate that goal by allowing disclosure of everything about those investigations so long as the disclosure occurs in some form other than the formal complaint that triggered the investigation and the formal transcript or recording of any ensuing interviews. Indeed, as Harmann correctly points out, Arganbright's interpretation of the statute would allow the person conducting an interview of an officer to disclose literally everything about the investigation and the officer's statements with impunity. There is no reasonable interpretation of the words "complaint" or "statement" in section 80F.1 that would allow for such a conclusion.

For this reason, among others, the Court rejects Arganbright's argument that the law was not "clearly established" that his disclosure of the Thomas report would violate Iowa Code § 80F.1(20). The words of a statute "in some cases will be specific enough to establish clearly the law applicable to particular conduct and circumstances and to overcome qualified immunity, even in the *total absence of case law.*" *Vinyard*, 311 F.3d at 1350; *see also McDonough v. Anoka Cnty.*, 799 F.3d 931, 944 & n.6 (8th Cir. 2015) (rejecting qualified immunity argument where statutory language was unambiguous). So it is here. The point of the Thomas report was to determine the validity of the complaints against Harmann in light of Harmann's interview and other evidence. As the report includes the substance of both the complaint and Harmann's interview, Harmann has stated a viable claim under section 80F.1(20) based on Arganbright's alleged disclosure of that report. The Court DENIES the Motion to Dismiss as to Division Five.

## V.    LEGAL ANALYSIS: OBJECTION TO MAGISTRATE JUDGE ORDER.

The final issue for the Court to address is Defendants' objection to the Text Order issued by United States Magistrate Judge William P. Kelly sealing the Thomas report. (ECF 10; ECF 15.) Defendants argue: (i) the report is not confidential under Iowa Code § 80F.1(20); or (ii) even if it is confidential, it should be unsealed in light of Harmann's decision to file claims revolving around the report. (ECF 8; ECF 15.)

For reasons explained in the preceding section, the Court disagrees with Defendants' position that the Thomas report is not protected by Iowa Code § 80F.1(20). An investigator's report

summarizing complaints made against a government official and the substance of the official's interview in response to those complaints falls within the scope of section 80F.1(20).

The Court agrees, however, that Harmann placed the Thomas report at issue in this litigation to a sufficient degree to warrant the report being unsealed. Thomas's Complaint includes extensive allegations regarding events leading up to Thomas's investigation (ECF 1, ¶¶ 23–41), the investigation itself (id., ¶¶ 42–50), and Thomas's conclusions (id., ¶¶ 51–53, 61). Harmann alleges, for example, that Thomas's report "clear[ed] Harmann of any professional misconduct" but that Arganbright and Bennett referred Harmann to the Iowa Law Enforcement Academy for disciplinary proceedings anyway. (Id., ¶ 61.) Having relied to such a significant degree on the Thomas report in asserting his claims, Harmann can no longer persuasively argue that the report should remain sealed. *See, e.g.*, *Steele v. City of Burlington*, 334 F. Supp. 3d 972, 977 (S.D. Iowa 2018) (holding that a presumption of public access applies to documents necessary to the resolution of the merits of a case). Instead, the Court ORDERS that the Thomas report (ECF 3-1) shall be unsealed and available to the public. *See* Iowa Code § 80F.1(20) (establishing that records are confidential "unless otherwise provided by law").

## VI.   CONCLUSION.

Harmann has stated viable claims against Arganbright in Divisions One and Five and both Arganbright and Bennett as to Divisions Two and Three. He has not stated any viable claims against Minteer, nor has he stated a viable claim against Arganbright or Bennett in Division Four. The Court therefore GRANTS IN PART and DENIES IN PART Defendants' Motion to Dismiss. (ECF 3.) The Court SUSTAINS Defendants' Appeal of Magistrate Judge Decision (ECF 15) and ORDERS that the Thomas report (ECF 3-1) be unsealed.

IT IS SO ORDERED.

Dated: February 5, 2025

STEPHEN H. LOCHER
U.S. DISTRICT JUDGE